# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

*David E. Patton*
Executive Director
*and Attorney-in-Chief*

*Southern District of New York*
*Jennifer L. Brown*
*Attorney-in-Charge*

The Government is directed to respond by
12 p.m. on April 28, 2020.

April 23, 2020

SO ORDERED.

*[signature]*

BY ECF
The Honorable Judge Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Paul G. Gardephe
United States District Judge
April 24, 2020

RE:   **United States v. Jose Brito**
      **20 CR. 63 (PGG)**

Honorable Judge Gardephe:

I write to respectfully request that the Court order Mr. Brito temporarily released on
bail or hold a bail hearing in the above-captioned case. At the time of Mr. Brito's presentment,
the defense consented to his detention with leave to apply for bail in the future. Given the
unprecedented health crisis caused by the devastating spread of COVID-19, Mr. Brito now
seeks release to his home in Manhattan with his wife and 4-year-old son.

Mr. Brito has been held at the MCC New York on an Illegal Reentry charge since
December 2019. Although only in his forties, he suffers from hypertension, a condition that
heightens his risk for facing serious or life-threatening symptoms if he were to contract
COVID-19, a dangerous illness spreading rapidly across the world and within New York City.
Mr. Brito's release from the MCC is necessary in light of the public health crisis that imperils
his health. See 18 U.S.C. § 3142(g)(3)(A) (listing a person's "physical and mental condition"
as one of the release factors to be considered in a bail application).

## I.   The COVID-19 Pandemic.

On March 11, 2020, the World Health Organization officially classified COVID-19 as a
pandemic.[1] As of the filing of this motion, the new strain of coronavirus, which causes COVID-
19, has infected over 2.5 million people, leading to at least 179,115 deaths worldwide.[2] New
York City is in a state of crisis–over 138,435 people have been infected by the virus; 9,944

---

[1] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), *at*
[2] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (April 5, 2020),
*at* https://nyti.ms/2U4kmud (updating regularly).

people have died. None of these statistics include the thousands upon thousands of people who are expected to have COVID-19 but have not been tested.

This health pandemic has been particularly devastating within detention facilities. Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease. See Exhibit A (Affidavit of Dr. Jonathan Giftos). Inmates cycle in and out of pretrial facilities from all over the world and the country, and people who work in the facilities leave and return daily, without adequate screening. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in pretrial detention centers. In a recent interview in *The New Yorker*, Homer Ventners, the former chief medical officer on Rikers Island (who was trained as a physician and an epidemiologist) presented a sober and disturbing account of the impact the virus is likely to have on prisons and jails. Ventners explained that "[a]ll of the new terms of art that everybody has learned in the last two weeks, like 'social distancing' and 'self-quarantine' and 'flattening the curve' of the epidemic— all of these things are impossible in jails and prisons, or are made worse by the ways jails and prisons are operated."[3]

It's no surprise that the city's jails have been hit hard by the spread of the COVID-19. At Rikers Island alone, 365 people detained at the facility have tested positive for the virus, as have 783 Department of Correction staff and 130 medical workers.[4] Two people have died of Covid-19 while in custody.[5]

The virus has been equally devastating within Bureau of Prison (BOP) facilities across the country. As of April 22, 2020, 566 inmates and 342 BOP staff have tested positive for COVID-19; at least **24 inmates have died because of the virus**.[6] As the charts below show, the rate of infection in BOP facilities far outpaces the overall rate of infection in the United States, China and Italy– the countries hardest hit by COVID-19.

---

[3] *How Prisons and Jails Can Respond to the Coronavirus*, The New Yorker (Mar. 14, 2020), *at* https://www.newyorker.com/news/q-and-a/how-prisons-and-jails-can-respond-to- the-coronavirus

[4] *Inside Rikers: An Account Of The Virus-Stricken Jail From A Man Who Managed To Get Out*, The Intercept (Apr. 21, 2020), at https://theintercept.com/2020/04/21/coronavirus-rikers-island-jail-nyc/.

[5] Id.

[6] Numbers obtained from www.bop.gov/coronavirus on a daily basis. There is good reason to believe that the numbers reported by the BOP understate the actual number of tested-positive cases. Compare M. Licon-Vitale, MCC Ward, and D. Edge, MDC Warden, *Response to EDNY Administrative Order 2020-14* (Apr. 7, 2020) *at* https://www.nyed.uscourts.gov/pub/bop/MDC_20200407_042057.pdf (3 positive inmates at MDC Brooklyn) with *COVID-19 Cases* Federal Bureau of Prisons (Apr. 7, 2020) *at* www.bop.gov/coronavirus (2 positive inmates at MDC Brooklyn). While the BOP website does not list any staff deaths, it confirmed one staff death potentially caused by COVID-19 on April 18, 2020. *Federal prisons confirm first staff death linked to coronavirus*, CBS News (Apr. 18, 2020), at https://www.cbsnews.com/news/coronavirus-federal-prisons-confirm-first-staff-death-linked-to-covid-19-robin-grubbs-usp-atlanta/.

| Location | Cases | Population | Infection Rate as Percent of Population | Infections/ 1,000 People |
|---|---|---|---|---|
| BOP Population | 908[7] | 179,407[8] | 5.06 | 0.5061% |
| United States | 837,947[9] | 329,553,138[10] | 2.54 | 0.2543% |
| China | 83,868[11] | 1,394,015,977[12] | 0.06 | 0.0060% |
| Italy | 187,327[13] | 62,402,659[14] | 3.00 | 0.3002% |



[7] Includes the number of both BOP inmates and staff who have tested positive for COVID-19. Numbers obtained from www.bop.gov/coronavirus on a daily basis. There is good reason to believe that the numbers reported by the BOP understate the actual number of tested-positive cases. *Compare* M. Licon-Vitale, MCC Ward, and D. Edge, MDC Warden, *Response to EDNY Administrative Order 2020-14* (Apr. 7, 2020) *at* https://www.nyed.uscourts.gov/pub/bop/MDC_20200407_042057.pdf (3 positive inmates at MDC Brooklyn) *with COVID-19 Cases* Federal Bureau of Prisons (Apr. 7, 2020) *at* www.bop.gov/coronavirus (2 positive inmates at MDC Brooklyn).

[8] Includes the number of federal inmates in BOP-managed institutions and the BOP staff complement. Numbers obtained from www.bop.gov/coronavirus on a daily basis

[9] Numbers obtained on 4/22/2020 at 6:53pm from https://coronavirus.jhu.edu/map.html

[10] Numbers obtained on 4/22/2020 at 6:56pm from https://www.census.gov/popclock/

[11] Numbers obtained on 4/22/2020 at 6:53pm from https://coronavirus.jhu.edu/map.html

[12] Numbers obtained on 4/22/2020 at 6:56pm from https://www.census.gov/popclock/

[13] Numbers obtained on 4/22/2020 at 6:53pm from https://coronavirus.jhu.edu/map.html

[14] Numbers obtained on 4/22/2020 at 6:56pm from https://www.census.gov/popclock/



These statistics show that within the confines of BOP jails and prisons, the virus spreads faster and infects greater numbers than in the community.

## II.    Health Risks Inside the MCC

Individuals detained at the MCC New York—a BOP pretrial detention facility housing approximately 700 people—are at serious risk of contracting the virus. See Exhibit A. The virus has already reached into the facility, and is now rapidly spreading. On March 23, 2020, two days after the Metropolitan Detention Center (MDC) confirmed that an inmate had tested positive for COVID-19, the MCC confirmed than an inmate in its facility was infected with coronavirus. **One month later, five inmates and twenty-four staff members–including MCC Warden M. Licon Vitale–have tested positive for COVID-19 at the MCC.** The low reported number of positive inmates is certainly the consequence of a lack of robust testing of inmates at the MCC– to date, only 6 of 718 inmates have been tested.

The number of confirmed cases at the MCC does not mean that the BOP has the virus under control. Tragic developments at other BOP facilities underscore the danger in assuming that low reported numbers mean low risk. On March 29, the BOP reported that five inmates were positive at FCI Oakdale– the same number currently reported at MCC.[15] By the third week of April, seven inmates had died from COVID-19.[16] Similarly, at FCI Elkton in Ohio, only two inmates were reported positive for COVID-19 by the BOP on April 3, 2020. Two weeks later, six inmates at Elkton had died because of the disease.[17] Most recently, FMC Fort Worth reported

---

[15] *COVID-19 Takes Life of Federal Inmate in Louisiana*, Forbes at
https://www.forbes.com/sites/walterpavlo/2020/03/29/covid-19-takes-life-of-federal-inmate-in-louisiana/#1fc5952763ab.
[16] *Something is Going to Explode: When Coronavirus Strikes a Prison*, NYTimes Magazine at
https://www.nytimes.com/2020/04/18/magazine/oakdale-federal-prison-coronavirus.html.
[17] *6 inmates have died from COVID-19 at Ohio federal prison,* KFVS12 at

seven positive cases among inmates on April 17, 2020. Today, less than one week later, there are 131 positive inmates and now, tragically, one person has died.[18]

There is no reasonable basis to conclude that the impact of COVID-19 in the MCC will be any less devastating. While BOP asserts that they are taking steps to screen and protect individuals at the MCC from infection, these steps are deeply inadequate:

> Given what we now know about how the novel coronavirus spreads and how often transmission occurs when an infected person is not displaying any symptoms whatsoever, even robust efforts to screen symptoms and isolate presumed positives are not enough to prevent transmission. Any system that relies on such a screening model will not stop the spread of the virus. From what we have learned, a combination of genuine and strict social distancing, handwashing, sanitation, and widespread testing and contact tracing are the measures effective to protect populations from rapid infection.

Exhibit A at ¶ 29. The social distancing and hygienic measures required to slow or stop the spread of the virus are not being taken. Male inmates at the MCC are housed in either two-man cells (originally designed for one person) or large dormitories with 20-30 people per dorm. Id. at ¶ 30-b. Within these housing configurations, inmates do not have the ability to practice social distancing. Nor is social distancing possible when inmates shower, eat, access medications or send emails. Even inmates in "quarantined units" at the MCC– which since March 31 has included most units at the MCC because of potential exposure to symptomatic or positive inmates– the basic activities of showering, lining up to eat and communicating with family or counsel, happen in groups. Id. at ¶28. Moreover, people detained at the MCC do not have the ability to maintain their hygiene to the degree necessary to avoid contracting COVID-19. There is no hand sanitizer in the institution. Id. at ¶30-i. Each inmate is allotted one small bar of soap per week, at most. Id. at ¶30-k. Inmates share telephones and computer terminals but do not have access to cleaning supplies like disinfectant wipes to clean the telephones and keyboards between uses. Id. at ¶30-n.

Beyond the unhygienic and crowded conditions, the MCC lacks the medical resources to properly treat and care for inmates who become ill due to COVID-19. Even before this pandemic, medical care at the MCC repeatedly failed to adequately address even routine medical issues.[19] In past times of crisis, the medical care at the facility has halted entirely.[20] Access to

---

https://www.kfvs12.com/2020/04/17/inmates-have-died-covid-ohio-federal-prison/.

[18] COVID-19 Cases Nearly Quadruple Inside Fort Worth Medical Prison, NBC DFW (Apr. 23, 2020), at

[19] *E.g., National Association of Women Judges (NAWJ) Women in Prison Committee (WIP) Second Visit to BOP's Metropolitan Detention Center (MDC), Brooklyn, New York, June 3, 2016*, at https://bit.ly/39JRhdW.

[20] During a recent eight-day lockdown at the MCC, inmates on one unit reported having been forced to share one toilet, one shower, and one sink among twenty-six people, and were prevented from washing their clothing: prime conditions for the spread, rather than containment, of infectious disease. On other units, toilets overflowed in two-man cells, spreading raw sewage.

medical care is particularly germane now in the current crisis. People who develop COVID-19 can deteriorate rapidly and require constant monitoring. Unfortunately, MCC has only two doctors during the week and none on the evenings or weekends. Id. at ¶31-b. The jail lacks a designated medical ward to allow sick and symptomatic inmates to isolate, rest and receive treatments. Id. at ¶31-a. In this setting, inmates with underlying health issues who contract COVID-19, are at a heightened risk of becoming seriously ill or dying.

## III.   The Sixth Amendment Demands Mr. Brito's Release.

The conditions of confinement at the MCC during the current pandemic have curtailed Mr. Brito's Sixth Amendment right to the effective assistance of counsel. Until he is released, Mr. Brito will continue to suffer violations of his constitutional rights.

The Sixth Amendment right to counsel is the cornerstone of our adversarial system of criminal justice. "The right to consult with legal counsel about being released on bond, entering a plea, negotiating and accepting a plea agreement, going to trial, testifying at trial, locating trial witnesses, and other decisions confronting the detained suspect, whose innocence is presumed, is a right inextricably linked to the legitimacy of our criminal justice system." Federal Defenders of New York, Inc. v. Bureau of Prisons, Docket No. 19-1778 (2d. Cir. Mar. 20, 2020). In recognition of this vital right, BOP regulations instruct that detention center wardens "shall provide the opportunity for pretrial inmate-attorney visits on a seven-days-a-week basis." 28 C.F.R. § 551.l 17(a) (emphasis added).

A detention facility therefore violates the Sixth Amendment when it "unreasonabl[y] interfere[s] with the accused person's ability to consult counsel." Benjamin v. Fraser, 264 F.3d 175, 185 (2d Cir. 2001). Unreasonable interference requires a showing far less alarming than the one present here. In Benjamin, the Second Circuit held that New York City correctional facilities violated the right to counsel when defense attorneys "routinely face[d] unpredictable, substantial delays in meeting with clients" and were "forced to wait between 45 minutes and two hours, or even substantially longer, after arriving at a facility to see a client." 264 F.3d at 179. These circumstances, where the Second Circuit refused to dissolve a consent decree providing judicial supervision of legal visitation in City correctional facilities, are far less jarring than those Mr. Brito has been forced to endure.

For nearly two months, Mr. Brito has experienced a complete disruption of his right to counsel. On February 27, 2020, the MCC entirely shut its doors to legal and social visitation for eight straight days. During that time, Mr. Brito was confined to a single jail cell 24 hours a day. He, like all inmates, was denied phone calls to his attorney and lacked computer access for more than a week. In all of March, there was a brief, three-day window during which counsel could communicate with clients in person. On March 10, 2020, the MCC reopened for counsel visits. Unfortunately, this period overlapped with the time that undersigned counsel was in a week long

---

Inmates with serious medical conditions, including AIDS and anemia, were denied medications or medical care. Female inmates were denied feminine hygiene supplies. No clean drinking water was provided; inmates were forced to drink from their bathroom sinks, from which brown water often ran.

trial. By the time trial ended, the doors to MCC had once again closed.

On Friday, March 13, 2020, in response to the public health crisis posed by COVID-19, the BOP issued a notice that all legal and social visits in all federal correctional facilities would be suspended for at least 30 days. Less than a month later, the BOP instituted a lockdown: no inmates are allowed out of the facility for any reason, including court appearances. Mr. Brito has been confined to a single cell, with limited access to phone calls or a computer to communicate with his attorney. When Mr. Brito finally obtained a legal call on April 21, 2010, it was in a counselor's office where he was deprived of a private, privileged conversation with counsel. This is inconsistent with the constitutional right to counsel. In Wolfish v. Levi, the Second Circuit held that the MCC "severely constrained" an inmate's "access to legal counsel" where dedicated attorney visiting hours were limited to two hours a day, and most attorney visits were "made in the general visiting rooms during visiting hours thereby entailing long delays, limiting the attorney's time with his client, and totally vitiating confidentiality." 573 F.2d 118, 133 (2d Cir. 1978) (holding the), rev'd on other grounds, 441 U.S. 520 (1979).

While Mr. Brito has had one call with defense counsel over the past two months, he has not been able to have any contact with his attorney on his immigration case– a case that overlaps with the Illegal Reentry charge. To mount an effective defense at trial and to ensure that his interests are fully and effectively represented in immigration court, Mr. Brito must be released from custody. This extraordinary moment requires judicial intervention to safeguard Mr. Brito's constitutional rights.


IV.    **The Federal Judiciary Has Repeatedly Set Bail Conditions for Previously Detained Individuals in Light of COVID-19.**

As the public health crises rapidly evolves, so too does the judiciary's perspective on release. The judiciary has begun to recognize and address this exceptional and unprecedented health crisis in countless cases.  Numerous judges in this District and in the Eastern District of New York have granted release on the basis of the growing COVID-19 crisis in the jail:

- United States v. Ramos, 20-CR-04 (ER) (S.D.N.Y. Mar. 19, 2020) (Dkt. No. 21). Judge Ramos released a defendant with chronic health issues on bail based on the threat of COVID-19, over the Government's objection and despite allegations that the defendant had continued to commit felonious conduct and violated his conditions of pre-trial release by seeking to defraud additional investors and communicating with witnesses and victims without counsel.

- United States v. Witter, 19-CR-568 (SHS) (S.D.N.Y. Mar. 26, 2020) (Dkt. No. 40). Judge Stein released a defendant, awaiting sentencing for narcotics conspiracy, from MCC, finding that "exceptional circumstances" existed to support his release under 18 U.S.C. 3145(c). Judge Stein noted that "COVID-19 presents an unprecedented public health crisis," that "the virus has infiltrated [MCC]" and that the defendant's age and medical condition placed him at higher risk for severe COVID-19 infection.

- United States v. Estime, 19-CR-711 (NSR) (S.D.N.Y. Mar. 25, 2020) (Dkt. No. 15). Judge Román released a 33-year old defendant, facing a cocaine conspiracy charge without any significant medical issues, from Valhalla on a PRB because of COVID-19.

- United States v. Hudson, 19 Cr. 496 (CM) (S.D.N.Y. Mar. 19, 2020) (Dkt. No. 72). Judge McMahon released, over Government objection, a defendant charged with narcotics conspiracy, loansharking, and extortion, whose bail application was twice denied due to the danger he posed to the community based on the violent nature of the charges, for 60 days. Judge McMahon cited the COVID-19 crisis and the ensuing difficulty of his attorneys in meeting defendant in preparation for his approaching trial.

- United States v. Brandon, 19 Cr. 644 (GBD) (S.D.N.Y. Mar. 24, 2020) (Dkt. No. 23). Judge Daniels temporarily released a defendant on his own recognizance due to COVID-19 risk, over the Government's objection that he was a serial violator of the law, who was awaiting sentencing on a guilty plea to escape from federal custody in failing to report to a halfway house, based on an underlying 24-month sentence for violation of his supervised release from a 2009 conviction for access device fraud and identity theft.

- United States v. Lopez, 19 Cr. 323 (JSR) (S.D.N.Y. Mar. 26, 2020). Judge Rakoff denied the Government's request for revocation and detention of a defendant who pleaded guilty to conspiracy to commit Hobbs Act robbery, attempted Hobbs Act robbery, and use of a firearm in relation to a drug trafficking crime, finding that "the coronavirus situation does create, on its own, an exceptional circumstance possibility," "the number of [coronavirus cases] has been increasing by a substantial percentage each day," the pandemic "creates a danger if [the defendant] is placed in a prison facility, regardless of where that facility is, while the virus is still increasing exponentially throughout the United States," and "the Bureau of Prisons is not really equipped to deal with this in anything like the way one would ideally want."

- United States v. Barrett, 19 Cr. 436 (KAM) (E.D.N.Y. Mar. 20, 2020) (Dkt. No. 45). Judge Matsumoto released, through joint agreement of the parties, a defendant charged with Medicare and Medicaid fraud and conspiracy to defraud the United States, because of the COVID-19 pandemic. The defendant was previously convicted of the same offense and at his bail hearing presented no credible sureties to ensure his appearance.

And for individuals like Mr. Brito who are charged with committing the offense of **illegal re-entry**, judges in this District have repeatedly set bail conditions and granted release:

- United States v. Suazo Nunez, 20 Mj. 1734 (UA)(S.D.N.Y. Apr. 20, 2020) (Dkt. No. 9). Judge Katherine H. Parker released the defendant, charged with one count of illegal re-entry, over the government's objection. The Court found that temporary release was necessary for preparation of the defense, discussion of a plea agreement and because the defendant had asthma and pneumonia.

- United States v. Felix Dominguez-Bido, 20 Cr. 34 (PAC) (S.D.N.Y.  Apr. 10, 2020) (Dkt. No. 15). Judge James L. Cott released the defendant, charged with one count of illegal re-entry, over the government's objection. The Court found that the defendant had demonstrated a "compelling reason" justifying his temporary release in light of the spread of COVID-19 and the defendant's underlying health issue (diabetes).

- United States v. Zoilo Taveras, 20 Cr. 240 (PAE) (S.D.N.Y. Apr. 1, 2020) (Dkt. No. 7). After initially being detained for an illegal re-entry charge, the defendant sought release due to the COVID-19 pandemic.  Judge Engelmayer granted release, imposing the condition of home detention and location monitoring.


**V.    The Bail Reform Act Requires Mr. Brito's Release.**

Even after a person has been ordered detained, the Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."  18 U.S.C. § 3142(i).

The health risk to Mr. Brito, because of his underlying medical condition, coupled with the conditions at the MCC, qualify as "compelling reason[s]" within 18 U.S.C. § 3142(i). Mr. Brito has been diagnosed with hypertension and is vulnerable to becoming seriously ill if he contracts COVID-19. Records from the 181st Street Urgent Care Center confirm Mr. Brito's diagnosis. These records show that in March 2019 Mr. Brito suffered a severe hypertensive episode. The clinic referred Mr. Brito to the Emergency Department for further testing and evaluation given the severity of his symptoms. BOP medical records also show that Mr. Brito was recently discovered to have a nasal polyp, a mass in his nose that obstructs his breathing.

Hypertension is a significant risk factor for COVID-19. In a recent study of adults hospitalized due to COVID-19, the CDC found that hypertension was the most commonly reported underlying condition (in 49.7% of the patients participating in the study)– ahead of obesity, lung disease and diabetes.[21] Similar results were found in a study published by the Journal of the American Medical Association (JAMA) of patients hospitalized with COVID-19 in New York City. This study found that over 56% of the 5,700 patients included in the study had hypertension.[22] In both studies, males had a higher mortality rate than females. A joint report from the World Health Organization and China indicated that mortality rates for people with hypertension who contract COVID-19 was 8.4%– compared to 1.4% for otherwise healthy individuals who contract the virus. Exhibit A at ¶10.

---

[21] Garg S, Kim L, Whitaker M, et al., *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET, 14 States, March 1–30, 2020.* MMWR Morb Mortal Wkly Rep, (Apr. 17, 2020), at https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm.
[22] Richardson S, Hirsch JS, Narasimhan M, et al. *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area.* JAMA, (Apr. 22, 2020), at https://jamanetwork.com/journals/jama/fullarticle/2765184.

Courts have long recognized that there is no greater necessity than keeping a defendant alive, no matter the charge. "We do not punish those who have not been proven guilty. When we do punish, we do not act cruelly. Continued incarceration of this terminally ill defendant threatens both of these fundamental characteristics of our democracy." United States v. Scarpa, 815 F. Supp. 88, 93 (E.D.N.Y. 1993) (pretrial defendant with AIDS facing murder charges released on bail because of the "unacceptably high risk of infection and death on a daily basis inside the MCC"); see also United States v. Adams, 2019 WL 3037042 (D. Or. July 10, 2019) (defendant charged with violation of the Mann Act and possession of child pornography and suffering from diabetes, heart conditions and open sores released on home detention because of his medical conditions); United States v. Johnston, 2017 WL 4277140 (D.D.C. Sept. 27, 2017) (defendant charged with violation of the Mann Act and in need of colon surgery released to custody of his wife for 21 days); United States v. Cordero Caraballo, 185 F. Supp. 2d 143 (D.P.R. 2002) (badly wounded defendant released to custody of his relatives).

This Court should consider the "total harm and benefits to prisoner and society" that continued pretrial imprisonment of Mr. Brito will yield, relative to the heightened health risks posed to him during this rapidly evolving pandemic.  See United States v. D.W., 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016); Davis v. Ayala, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant); United States v. Mateo, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (reducing sentence where defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case"); United States v. Francis, 129 F. Supp. 2d 612, 619-20 (S.D.N.Y. 2001) (reducing sentence in acknowledgment of "the qualitatively different, substandard conditions to which the Defendant was subjected" in pretrial detention).

In addition, continued detention is not necessary to ensure the primary goals of pretrial detention—appearance in court and community safety. Mr. Brito is not a danger to the community. His sole charge is Illegal Reentry and he has no prior history of violent or assaultive conduct. Nor does Mr. Brito pose a serious risk of flight if released. The very nature of the charge against Mr. Brito–that he keeps returning to New York City despite deportation– suggests that he is not a flight risk. New York City has become Mr. Brito's home. He lives in the city with his wife and four year old son, J.B.– an American citizen. He has two other children in New York City who are also citizens. These family ties demonstrate that Mr. Brito has no incentive to flee.

Significantly, statistics demonstrate that nearly everyone on pretrial release in the federal system appears in court and does not reoffend. In 2019, 99% of released federal defendants nationwide appeared for court, and over 98% did not commit new offenses while on bond.[23]

---

[23] See AO Table H-15, http://jnet.ao.dcn/sites/default/files/pdf/H15_Ending12312019.pdf

**Table H-15.**
**U.S. District Courts ---- Pretrial Services Violations Summary Report**
**For the 12-Month Period Ending September 30, 2019**

| Circuit and District | Total Cases Open | Cases In Release Status | Pct. | Cases with Violations | Pct. | Rearrest Violations | | | FTA Violations | Technical Violations | Reports to Court |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Felony | Misde-meanor | Other | | | |
| TOTAL | 193,632 | 53,476 | 27.6 | 8,761 | 16.4 | 406 | 505 | 65 | 618 | 8,086 | 13,544 |

Moreover, this near-perfect compliance rate is seen equally in federal districts with very high release rates (~70%) and those with very low release rates (~24%).[24] The chart below reflects this data:



[24] The six federal districts with the lowest release rates (average 24.37%) have an average failure to appear rate of 1.78%, while the six districts with the highest release rates (average 69.08%) have an even lower failure to appear rate of 0.42%. See AO Table H-15; Table H-14A, https://www.uscourts.gov/sites/default/files/data_tables/jb_h14a_0930.2019.pdf. The six districts with the lowest release rates have an average re-arrest rate of 1.10%, while the six districts with the highest release rates have an average re-arrest rate of 0.91%. See Table H-15. (The districts with the lowest release rates are D. Utah, E.D. Oklahoma, W.D. Arkansas, S.D. Texas, E.D. Tennessee, and S.D. California; the districts with the highest release rates are D. Guam, D. Northern Mariana Islands, W.D. Washington, D. Connecticut, D. Maine, and D. Hawaii. See Table H-14A.)

## VI.     Proposed Conditions of Release.

Given the extraordinary circumstances of this public health crisis, I propose that Mr. Brito be released pursuant to the following conditions:

- $25,000 personal recognizance bond, co-signed by 2 financially responsible persons;
- Home incarceration enforced by location monitoring at the discretion of Pretrial;
- Travel restricted to SDNY and EDNY;
- Supervision as directed by Pretrial Services; and
- Surrender of any travel documents and no new applications.

If released, Mr. Brito will live with his wife and son at ███████████████████

Mr. Brito's life, not just his liberty, is on the line, creating a powerful incentive to abide by any release conditions the Court may impose. The chronically ill, no matter what crime they are accused of, pose a lower risk of violating supervision, particularly during a global pandemic during which even leaving the house will endanger their lives.

The strict conditions that I propose mitigate both any danger that Mr. Brito poses to the community, and any risk of flight. These conditions further recognize the need to protect Mr. Brito's physical health in the midst of this unprecedented global crisis.

Thank you for your consideration of this request.

Respectfully submitted,

/s/_____
Zawadi Baharanyi
Assistant Federal Defender
(917) 612-2753

cc:     AUSA Nicholas Chiuchiolo (by ECF)

# EXHIBIT A

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
                                                          :
                                                          :
APPLICATION OF VULNERABLE                                 :
DETAINEE FOR RELEASE FROM MCC                             :
NEW YORK                                                  :
                                                          :     SUPPLEMENTAL AFFIDAVIT OF
                                                          :     JONATHAN GIFTOS, M.D.
                                                          :
                                                          :     (CORRECTED0
                                                          :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
```

I, Jonathan Giftos, hereby affirm as follows:

1.      I am a doctor duly licensed to practice medicine in the State of New York. I am board certified in internal medicine and addiction medicine.

2.      I am currently the Medical Director, Addiction Medicine & Drug User Health at Project Renewal and a Clinical Assistant Professor in the Department of Medicine at Albert Einstein College of Medicine.  I was previously the Clinical Director of Substance Use Treatment for NYC Health & Hospitals, Division of Correctional Health Services at Rikers Island.  In that capacity, I was responsible for the diversion, harm reduction, treatment and reentry services for incarcerated patients with substance use disorders.  I further served as the medical director of the Key Extended Entry Program (KEEP), the nation's oldest and largest jail-based opioid treatment program that provides methadone and buprenorphine to incarcerated patients with opioid use disorders.

3.      I have extensive experience working with vulnerable populations such as the incarcerated and those experiencing homelessness.

4.      I submit this updated affidavit in support of vulnerable detainees' (as defined by the CDC) Motion for Release from Custody during the COVID-19 pandemic. This Affidavit updates information that was included in the Affidavit that I prepared on March 18, 2020, and takes account of new information, including new medical research on COVID-19 and new data regarding MCC New York.

## I.      Coronavirus Epidemic in New York City

5.      On March 11, 2020, the World Health Organization declared that the rapidly spreading outbreak of COVID-19, a respiratory illness caused by a novel coronavirus, is a pandemic, announcing that the virus is both highly contagious and deadly.[1]  To date, the virus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.[2]  The virus can linger on surfaces such as tables, faucet handles, and door handles for as long as three days.[3] The CDC also warns of "community spread" where the virus spreads easily and sustainably within a community where the source of the infection is unknown.[4]

---

[1] *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19*, World Health Organization (Mar. 11, 2020), *at* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2] *How COVID-19 Spreads*, Centers for Disease Control and Prevention (Apr. 13, 2020), *at* https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

[3] *Cleaning and Disinfection for Households*, Centers for Disease Control and Prevention (Mar. 28, 2020), *at* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cleaning-disinfection.html.

[4] *Id*.

6.      As of April 16, 2020, the novel coronavirus has infected over 1,954,724 people leading to 126,140 deaths worldwide. [5]  That is an increase by a factor of ten over the numbers I reported in my earlier affidavit less than one month ago.  The United States now has the most infections in the world, with at least 636,917 confirmed cases and 28,586 deaths from the virus, a one-hundred-fold increase in the number of cases and a 220-fold increase in the number of American deaths since March 18.[6]  There are confirmed coronavirus cases in every state, the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands.

7.      Governor Cuomo declared a State of Emergency in New York State on March 7, 2020.  Mayor de Blasio declared a State of Emergency in New York City on March 12, 2020.  As of April 16, 2020, there are at least 213,779 positive cases in New York State with 118,302 of those cases in New York City, also representing an increase of two orders of magnitude above the numbers observed last month.[7]  Among the confirmed cases in New York City are people who work in the Bureau of Prisons, courthouses, law enforcement, legal offices, and the medical field, increasing the likelihood of exposure to and by inmates.  Some of the early cases included a security officer and an agent in the U.S. Attorney's Office, SDNY;[8] a NYC Department of Correction investigator (who has died from the virus);[9] a lawyer with an office in Midtown

---

[5] *Novel Coronavirus Situation Dashboard*, World Health Organization (Apr. 16, 2020), *at* https://who.sprinklr.com/ (updating regularly).

[6] *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times (Apr. 16, 2020)*, at* https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (updating regularly).

[7] *Id.*

[8] Email Communication from Edward Tyrrell, U.S. Attorney's Office, SDNY (Mar. 14, 2020).

[9] Aliza Chasen, *NYC Corrections Officer Dies of Coronavirus*, Pix 11 (Mar. 18, 2020), *at* https://www.pix11.com/news/coronavirus/nyc-correction-officer-dies-of-coronavirus.

Manhattan (and his wife and son);[10] a healthcare worker in Manhattan; an attorney and legal intern

in local New York State courts; and an attorney at the Brooklyn Supreme Court.[11]  Since then, the

numbers have skyrocketed, and now include fatalities: a Brooklyn Supreme Court judge died of

coronavirus complications within two weeks of presiding over a courtroom full of litigants and

members of the public.[12]  The coronavirus is inside the local jails where federal inmates are held:

25 inmates and 10 staff members have tested positive at the Queens Detention Facility ("GEO

Queens"); 5 inmates and 14 staff members have tested positive at MDC Brooklyn; and 5 inmates

and 19 staff members have tested positive at MCC New York.[13]

        8.     There is currently no vaccine or cure.  Public health officials are primarily focused

on preventing the spread of the virus. To prevent new infections, the Centers for Disease Control

and Prevention strongly recommend the following actions: thorough and frequent handwashing,

regularly cleaning surfaces with EPA-approved disinfectants, maintaining at least six feet of space

between people, and avoiding all group gatherings.[14]  Social distancing has also been encouraged,

---

[10]  *11 Cases of COVID-19 Confirmed in NY after Family, Friends of Lawyer Test Positive*, NBC New York (Mar. 5, 2020) *at* https://www.nbcnewyork.com/news/local/nyc-attorney-in-critical-condition-city-works-to-trace-movements-awaits-more-tests/2311723/.

[11] *Coronavirus and the New York State Courts: Tested Positive for Covid19*, New York State Unified Court System (Apr. 15, 2020), *at* http://www.nycourts.gov/covid-positive.shtml.

[12] *Id.*; Noah Goldberg, *A Brooklyn Courthouse was still Packed as Coronavirus Spread*, New York Daily News (Apr. 8, 2020) *at* https://www.nydailynews.com/coronavirus/ny-coronavirus-brooklyn-supreme-court-civil-covid-19-judges-attorneys-20200409-byebigdbpbcv3he7wf5hxombju-story.html.

[13] *See* April 14, 2020 Letter from MCC Warden to Chief Judge Mauskopf, *at* https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200414_040934.pdf; April 14, 2020 Letter from Queens Detention Facility Administrator, *at* https://www.nyed.uscourts.gov/pub/bop/QDF_20200414_041032.pdf.

[14] *How to Protect Yourself and Others*, Centers for Disease Control and Prevention (Apr. 13, 2020), *at* https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html.

and in many places mandated, to slow the rate of COVID-19 infections so that hospitals have the resources to address infected individuals with urgent medical needs.[15]   The CDC now recommends that everyone wear a mask or cloth face covering whenever they go out in public.[16] In correctional settings, such sanitation, social distancing, face-covering and self-quarantining measures are nearly impossible especially when inmates are routinely housed, shackled, and escorted with other prisoners.[17]

## II.   Certain Identifiable Populations Are Far More Vulnerable To COVID-19 Than The Population At Large.

9.   The CDC has identified certain groups of people at higher risk of contracting and succumbing to COVID-19: older adults, and people with chronic medical conditions including lung disease, asthma, heart conditions, obesity, diabetes, chronic kidney disease, HIV/AIDS, and immune system disorders.[18]

10.   COVID-19 is more dangerous to persons in these high-risk groups than to the general population.  Older people who contract COVID-19 are more likely to die than people under the age of 60.  In a February 29th WHO-China Joint Mission Report, the preliminary mortality rate

---

[15] *Coronavirus, Social Distancing, and Self-Quarantine*, Johns Hopkins Medicine (Apr. 11, 2020), *at* https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine.

[16] *See* n.14.

[17] *See* Danielle Ivory, *We Are Not a Hospital: A Prison Braces for the Coronavirus*, New York Times (Mar. 18, 2020), *at* https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html.

[18] *People Who Are at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention (Apr. 15, 2020), *at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html; *see also Report of the WHO-China Joint Mission on Coronavirus Disease (COVID-19)*, World Health Organization (Feb. 16-24, 2020), *at* https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf, at 12.

analyses showed that individuals age 60-69 had an overall 3.6% mortality rate and those 70-79 years old had an 8% mortality rate.[19]  For individuals 40 years and younger, the mortality rate was as low as .2%.  It has been found that older people diagnosed with COVID-19 are more likely to be very sick and require hospitalization to survive because the acute symptoms include respiratory distress, cardiac injury, arrhythmia, septic shock, liver dysfunction, kidney injury and multi-organ failure.  Access to a mechanical ventilator is often required.  People with chronic medical conditions (no matter their age) are also at significantly greater risk from COVID-19 because their already-weakened systems are less able to fight the virus.  These chronic medical conditions include asthma, hypertension, lung disease, cancer, heart failure, cerebrovascular disease, renal disease, liver disease, diabetes, immunocompromising conditions, and pregnancy.  Those with pre-existing medical conditions have a higher probability of death if infected.  The WHO-China Joint Mission Report provides that the mortality rate for those with cardiovascular disease was 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[20]

## III.  Correctional Settings Increase The Risk Of Transmission

11.     Correctional settings increase the risk of contracting an infectious disease, like COVID-19, due to the high numbers of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to

---

[19] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths*, Worldometers (Feb. 29, 2020), *at* https://www.worldometers.info/coronavirus/coronavirus-age-sex-demographics/ (data analysis based on WHO-China Joint Mission Report, *supra* n.18).

[20] *Report of the WHO-China Joint Mission on Coronavirus Disease (COVID-19),* https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf at 12.

medical care, and no possibility of staying at a distance from others.  Correctional facilities house large groups of inmates together, and move inmates in groups to eat, do recreation, receive medication, and shower.  Inmates share telephones, email terminals, and tables to eat at.  They frequently have insufficient medical care for the population, and, in times of crisis, even those medical staff cease coming to the facility.  Hot water, soap and paper towels are frequently in limited supply.  Inmates, rather than professional cleaners, are responsible for cleaning the facilities and often are not given appropriate supplies.  This means there are more people who are susceptible to getting infected, congregated together, in a context in which fighting the spread of an infection is nearly impossible.

12.     Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[21]

13.     A COVID-19 outbreak is well underway in New York City jails. The first reported instance of a person in New York City Department of Corrections ("DOC") custody testing positive was March 18, 2020.[22]   As of April 15, 2020, just 28 days later, there were 1086 confirmed cases of the virus in the DOC system: 334 people in custody (with two deaths), 95 Correctional Health Services staff, and 657 DOC staff.[23]

---

[21] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY.

[22] *Rikers Reports its First COVID-Related Prisoner Death*, New York Intelligencer (April 6, 2020), at https://nymag.com/intelligencer/2020/04/rikers-island-reports-its-first-covid-related-prisoner-death.html.

[23] Daily Covid-19 Update, Monday, April 13, 2020, New York City Board of Correction, at https://www1.nyc.gov/assets/boc/downloads/pdf/Meetings/2020/April/Board%20of%20Correcti on%20Daily%20Pu blic%20Report_4_13_2020_final.pdf.

IV.     **The BOP Is Experiencing A Dangerous Increase In COVID-19 Cases**

14.     Based on my review of the daily numbers published on the BOP's website, and its multi-phase protocol which went into effect at all BOP facilities on March 13, 2020, COVID-19 is also rising at a dangerous rate in the BOP nationwide despite the protocols it has adopted.  The rate of increase is far more rapid than it is in the population at large.  The first two BOP cases (both staff cases) were reported on March 20, 2020.  As of April 15, 2020, BOP reported: 451 positive inmates and 49 now-recovered inmates (450 total cases); 280 positive staff and 18 now-recovered staff (298 staff cases); 17 inmate deaths; 0 staff deaths.   In the single day between April 13, 2020 and April 14, 2020, there were over 100 new BOP positive cases reported among inmates and staff.

BOP-Reported Positive Tests for COVID-19 Nationwide[24]

| Date | Number of Positive Inmates | Number of Positive Staff | Number of Inmate Deaths |
|---|---|---|---|
| 3/19/2020 | 0 | 0 | 0 |
| 3/20/2020 | 0 | 2 | 0 |
| 3/21/2020 | 1 | 2 | 0 |
| 3/22/2020 | 1 | 2 | 0 |
| 3/23/2020 | 3 | 3 | 0 |
| 3/24/2020 | 6 | 3 | 0 |
| 3/25/2020 | 6 | 3 | 0 |
| 3/26/2020 | 10 | 8 | 0 |
| 3/27/2020 | 14 | 13 | 0 |
| 3/28/2020 | 19 | 19 | 1 |
| 3/29/2020 | 19 | 19 | 1 |
| 3/30/2020 | 28 | 24 | 1 |
| 3/31/2020 | 29 | 30 | 1 |
| 4/1/2020 | 57 | 37 | 3 |
| 4/2/2020 | 75 | 39 | 6 |

---

[24] Numbers obtained from www.bop.gov/coronavirus on a daily basis.

| | | | |
|---|---|---|---|
| 4/3/2020 | 91 | 50 | 7 |
| 4/4/2020 | 120 | 54 | 8 |
| 4/5/2020 | 138 | 59 | 8 |
| 4/6/2020 | 195 | 63 | 8 |
| 4/7/2020 | 241 | 72 | 8 |
| 4/8/2020 | 272 | 105 | 8 |
| 4/9/2020 | 283 | 125 | 8 |
| 4/10/2020 | 318 | 163 | 9 |
| 4/11/2020 | 335 | 185 | 9 |
| 4/12/2020 | 352 | 189 | 10 |
| 4/13/2020 | 388 | 201 | 13 |
| 4/14/2020 | 446 | 248 | 14 |
| 4/15/2020 | 451 | 280 | 16 |

This is a dramatic percentage increase within the BOP as compared to the national percentage

increase of positive cases:

### Percentage of Increase of Infected BOP People (Inmates and Staff) Since 3/20/2020[25]

| Date | Number of BOP Cases[26] | BOP Percentage Increase Since 3/20/2020 | National Percentage Increase Since 3/20/2020 | Number of National Cases |
|---|---|---|---|---|
| 3/20/2020 | 2 | 0% | 0% | 18,747 |
| 3/21/2020 | 3 | 50% | 31% | 24,583 |
| 3/23/2020 | 6 | 200% | 135% | 44,183 |
| 3/24/2020 | 9 | 350% | 190% | 54,453 |
| 3/26/2020 | 18 | 800% | 355% | 85,356 |
| 3/27/2020 | 27 | 1250% | 451% | 103,321 |
| 3/29/2020 | 38 | 1800% | 651% | 140,904 |
| 3/30/2020 | 52 | 2500% | 772% | 163,539 |
| 3/31/2020 | 59 | 2850% | 892% | 186,101 |
| 4/1/2020 | 94 | 4600% | 1036% | 213,144 |
| 4/2/2020 | 114 | 5600% | 1176% | 239,279 |
| 4/3/2020 | 141 | 6950% | 1379% | 277,205 |
| 4/4/2020 | 174 | 8600% | 1526% | 304,826 |
| 4/5/2020 | 197 | 9750% | 1665% | 330,891 |

---

[25] National numbers obtained from www.cdc.gov and https://coronavirus.jhu.edu/map.html
[26] Includes the number of both BOP inmates and staff who have tested positive for COVID-19

| | | | | |
|---|---|---|---|---|
| 4/6/2020 | 259 | 12850% | 1897% | 374,329 |
| 4/7/2020 | 313 | 15550% | 1963% | 386,800 |
| 4/8/2020 | 377 | 18750% | 2140% | 419,975 |
| 4/9/2020 | 408 | 20300% | 2349% | 459,165 |
| 4/10/2020 | 481 | 23950% | 2527% | 492,416 |
| 4/11/2020 | 520 | 25900% | 2704% | 525,704 |
| 4/12/2020 | 541 | 26950% | 2860% | 554,849 |
| 4/13/2020 | 589 | 29350% | 2989% | 579,005 |
| 4/14/2020 | 694 | 34600% | 3129% | 605,390 |
| 4/15/2020 | 731 | 36450% | 3294% | 636,350 |

In graphic terms:



15.     These increases continue despite the BOP's ongoing action plans.  On March 13, 2020, the BOP announced that it was implementing the COVID-19 Phase Two Action Plan in order to minimize the risk of COVID-19 transmission into and inside its facilities.[27]  As of that date, the Action Plan comprised the following measures: all incoming inmates were screened, and staff were regularly screened; contractor visits were limited to essential services, while nearly all attorney, social, and volunteer visits were suspended; inmate movements between facilities were limited; and institutions were taking additional steps to modify operations to maximize social distancing.[28]

16.     On April 1, 2020, the BOP began implementing its Phase Five Action Plan to decrease the spread of COVID-19, which provides for securing each inmate in every BOP institution to her or her assigned cells/quarters for a period of fourteen days.[29]

17.     On April 14, 2020, the BOP announced implementation of its Phase Six Action Plan, which extends the lockdown of inmates for an additional 30 days.[30]

**V. Specific Conditions and Protocols at MCC New York**

18.     Based on my understanding of the specific conditions at the federal pre-trial detention center in Manhattan ("MCC") as contained in published reports, including MCC's responses to the Administrative Order of Chief Judge Mauskopf (EDNY), and as communicated to me by Deirdre D. von Dornum, Attorney-in-Charge of the Federal Defenders of New York,

---

[27] https://www.bop.gov/resources/news/20200313_covid-19.jsp
[28] https://www.bop.gov/resources/news/20200313_covid-19.jsp

[29] *See* https://www.bop.gov/resources/news/20200331_covid19_ action_plan_5.jsp.

[30] https://www.bop.gov/coronavirus/covid19_status.jsp

these conditions pose heightened risks to already vulnerable inmates of contracting the novel coronavirus and of developing acute symptoms from the virus.

19.     COVID-19 has already entered MCC New York.  As of April 15, 2020, the facility reported that 5 inmates and 19 staff members had tested positive.[31]  It is my understanding that two of the 5 inmates were housed on a single open dorm unit, which contains a number of at-risk inmates, all of whom sleep on bunk beds in close proximity and share one toilet and two sinks.  A third inmate was housed on an adjoining open dorm unit.  A fourth inmate was housed on the seventh floor, where men are double-celled.  He came into contact with his cellmate, other inmates on the unit, and unit staff before being recognized as symptomatic.  Those staff have since moved through other areas in the facility.   A fifth inmate was housed on unit 5S, where men are double-celled.  Two tiers of that unit (5S) have now been covered in plastic, in an apparent effort to isolate sick men.  Covering surfaces in plastic does nothing to stop the spread of the coronavirus; the plastic itself simply becomes a vector for its transmission.

20.     The numbers of positive inmates reported by the MCC is almost certainly a dangerous undercount.  To date, the facility has only tested 6 of 718 inmates.  The MCC has not disclosed its testing criteria, and appear only to be checking symptomatic inmates' temperatures, which is insufficient for identifying positive cases.  The actual number of COVID-19 cases is surely much higher. Without more information about testing criteria, there is a serious risk of under-identifying the number of actual COVID-19 cases in MCC New York.  Jails in the region with more robust testing report much higher rates: for example, on Rikers Island, there are 334

---

[31] *See* April 14, 2020 Letter from MCC Warden to Chief Judge Mauskopf, *available at* https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200414_040934.pdf.

tested-positive inmates.[32]  There is no reasonable basis to conclude that the MCC, which is served

by staff from the same community as Rikers Island, continues to admit new inmates as recently as

April 10, 2020, and has limited protective equipment, is immune from this spread.  With a deflated

denominator—testing only 6 people—there is no way to know the true "attack rate" inside the

MCC.  The fact that the number of positive staff at MCC increases daily (as reported on the BOP's

official website), while the number of positive inmates (and the number of inmates tested) remains

largely static further supports this.  The staff are tested outside the facility, and do not have to rely

on BOP for tests, unlike the inmates.  A useful point of comparison is GEO Queens, the private

contract facility which houses entirely federal prisoners from EDNY and SDNY.  Until recently,

GEO was not testing most symptomatic inmates.  As of April 3, 2020, GEO reported testing only

4 inmates, 1 of whom was positive.[33]   But GEO subsequently decided to do more widespread

testing of symptomatic inmates:  as of April 14, 2020, GEO Queens reported testing 37 inmates,

25 of whom were positive.[34]

      21.     The MCC has stated that it is screening inmates for symptoms of coronavirus in

making decisions whether to provide medical care, quarantine, and isolate.[35]  Recent evidence

---

[32] Daily Covid-19 Update, Tuesday, April 14, 2020,
https://www1.nyc.gov/assets/boc/downloads/pdf/News/covid-19/Public_Reports/Board%20of%20Correction%20Daily%20Public%20Report_4_14_2020_To%20publish.pdf

[33] *See* April 3, 2020 Letter to Chief Judge Mauskopf from GEO Queens, available at
https://img.nyed.uscourts.gov/files/reports/qdf/20200403%20QDF%20Report.pdf.

[34] *See* April 14, 2020 Letter to Chief Judge Mauskopf from GEO Queens, available at
https://www.nyed.uscourts.gov/pub/bop/QDF_20200414_041032.pdf.

[35] *See* April 14, 2020 Letter from MCC Warden to Chief Judge Mauskopf, *available at*
https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200414_040934.pdf.

shows the inadequacy of symptom-based screening tools in preventing the transmission of COVID-19.

22.     Experts continue to learn more about the transmission of novel coronavirus. Recent evidence has aided scientists and healthcare professionals in understanding why COVID-19 spreads so rapidly and dangerously. While it is well-known that symptomatic people transmit the virus, two additional transmission categories are essential to understanding the alarming rate of infection linked with the novel coronavirus: (1) asymptomatic transmission, or people who are infected and contagious but never display the symptoms associated with COVID-19, and (2) presymptomatic transmission, or people who are contagious before they begin to show symptoms.

23.     At the end of March, CDC director Dr. Robert Redfield warned that as many as 25% of people infected with COVID-19 may not show symptoms.[36]  On April 1, 2020, the CDC published a critically important study finding evidence of presymptomatic transmission.[37]  When summarizing the implications of the study for public health practice, the CDC warned that "[t]he potential for presymptomatic transmission underscores the importance of social distancing, including the avoidance of congregate settings, to reduce COVID-19 spread."[38]

---

[36] Mandavilli, Apoorva. Infected but Feeling Fine: The Unwitting Coronavirus Spreaders, The New York Times (March 31, 2020), at https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[37] Presymptomatic Transmission of SARS-CoV-2 — Singapore, January 23–March 16, 2020. MMWR. Morbidity and Mortality Weekly Reports, at https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6914-H.pdf.

[38] *Id.,* p. 412.

24.     Based on my review of the BOP's Phase Five and Six Protocols and the MCC's responses to the Administrative Order of Chief Judge Mauskopf requiring disclosure of screening and testing protocols, MCC currently uses the same protocols as the BOP nationwide. Specifically, MCC uses a symptom-based screening model to guide isolation and quarantine practices.  The BOP has just implemented the sixth phase of its response protocols to COVID-19.  Over the last several weeks, those protocols have included the cancellation of various classes of visitors, limited group gatherings, and authorized quarantines.[39]  Such measures are useful to a degree.  However, staff continue to enter the facility every day from the community with only minimal screening.   Staff come from across New York City and State, and from New Jersey and Pennsylvania, entering and exiting the facilities in two to three separate shifts each day, and potentially working in different housing areas on a daily basis, including moving from quarantined to non-quarantined units.

25.     The BOP protocols mandate "screening each and every staff member who walks in the door."[40]  This screen is quite limited: "[s]pecifically, a temperature is being taken and the staff member is asked to fill out a screening form.  If the staff member has a fever or answers yes to any of the questions, a medical professional can deny entry to the institution."[41]  The staff screening form, which is publicly available on the BOP website, permits staff to work at the institution even if they report trouble breathing.  *See* BOP Coronavirus Disease Staff Screening

---

[39] *See* BOP website,
https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.

[40] *Id.*

[41] Letter of April 9, 2020 from MCC Warden to Chief Judge Mauskopf, at
https://www.nyed.uscourts.gov/coronavirus.

Form, attached as Exhibit A.   The Staff Screening Tool does not include any questions about recent exposure to persons who are symptomatic or have tested positive.  *Id.*  This is in contrast to the BOP Coronavirus Disease Visitor Screening Form, which explicitly asks whether the visitor has "had close contact with anyone diagnosed with the COVID-19 illness within the last 14 days."  *See* Visitor/Volunteer/Contractor Screening Tool, attached as Exhibit B.

26.     Under these protocols, which have been in place since March 13, 2020, the number of MCC staff members who tested positive has risen steadily; from April 3 through April 15, that number more than doubled: from 7 to 19.[42]  Significantly, in a CDC report published March 18, 2020, an epidemiological investigation revealed that coronavirus-infected staff members contributed to the outbreak in a nursing home facility with ineffective infection control and prevention and staff members working in multiple facilities.[43]  For the 19 MCC officers who have already tested positive, it is unknown how many inmates and other officers those officers exposed prior to testing positive.  The MCC has not reported the assignments or locations of any infected staff member to the Court, Federal Defenders, or the inmates.  Given what we now understand about evidence of asymptomatic and presymptomatic transmission, the same risks appear to exist in MCC New York as did in the nursing home setting.  Without contact tracing of those people whom the infected staff members came into contact with, there is no meaningful way to stop the spread of the virus.

---

[42] *Compare* Letter of April 3 and Letter of April 14 from MCC Warden to Chief Judge Mauskopf, at https://www.nyed.uscourts.gov/coronavirus.

[43] COVID-19 in a Long-term Care Facility—King County Washington, February 27-March 9, 2020, https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6912e1-H.pdf.

27.     During this same time period of April 3 to April 14, 2020, the number of positive

tests among inmates has remained relatively stagnant; so too has the number of tests given.  As

of April 3, 2020, the MCC had tested 5 inmates, 4 of whom were positive; as of April 14, 2020,

the MCC had tested 6 inmates, 5 of whom were positive.[44]  The MCC has not explained why

only one additional inmate was tested in eleven days.  The MCC is also using symptoms, in

particular elevated temperature readings, as the primary method of screening inmates: "Any

inmate currently in BOP custody who presents with COVID-19 like symptoms is assessed by the

institution health services staff.  An inmate exhibiting symptoms consistent with COVID- 19 will

be placed in isolation.  The remainder of the inmates on his or her unit will be quarantined to

ensure additional inmates do not develop symptoms.  The inmates' medical isolation will be

evaluated by medical staff at least twice a day, and the inmates on a medically quarantined unit

will have their temperature checked twice a day." [45]  MCC New York has stated it "does not

have COVID-19 tests."[46]  Instead, inmates are only tested if they are taken to a hospital because

of the severity of their symptoms.  In the absence of testing, it is not possible to know the toll of

COVID-19 on the MCC New York inmate population.

28.     Beginning on March 31, almost all of the units in MCC were deemed "quarantined"

because of exposure of inmates on the units to other symptomatic or positive inmates.  However,

this quarantine is not isolation: quarantined inmates are not allowed to leave their units, but

---

[44] *Compare* Letter of April 3 and Letter of April 14 from MCC Warden to Chief Judge
Mauskopf, at https://www.nyed.uscourts.gov/coronavirus.

[45] Letter of April 9, 2020 from MCC Warden to Chief Judge Mauskopf, at
https://www.nyed.uscourts.gov/coronavirus.

[46] *See* April 1, 2020 Letter from Warden to Hon. Paul A. Engelmayer, *United States v. Bryant
Brown*, 20 Cr. 12 (PAE), ECF No. 11-1.

continue to share dormitory spaces and double-cells, to use shared phones and computers, to share shower space, and to congregate at the pill line and for meals. Accordingly, so-called "quarantined" housing units appear to differ in no appreciable way from non-quarantined units under the Phase Five and Six lockdown rules confining inmates to their cells and units.

29.     Given what we now know about how the novel coronavirus spreads and how often transmission occurs when an infected person is not displaying any symptoms whatsoever, even robust efforts to screen symptoms and isolate presumed positives are not enough to prevent transmission. Any system that relies on such a screening model will not stop the spread of the virus. From what we have learned, a combination of genuine and strict social distancing, handwashing, sanitation, and widespread testing and contact tracing are the measures effective to protect populations from rapid infection.

30.     The size of the population and the conditions of confinement at MCC increase the risk substantially of the virus spreading further, because it is impossible for inmates to maintain a six-foot distance from others, to avoid groups, or to implement sufficient hand-washing and sanitization of surfaces, and staff are not provided adequate protective equipment or quarantined after exposure to positive inmates or positive staff.

a.     The current population at MCC is 718 inmates.[47] At least 25% of the population (and likely a higher percentage) fall into the high risk groups identified by the CDC.[48] The

---

[47] *See* https://www.bop.gov/locations/institutions/nym/ (updated regularly).

[48] The MDC has provided a list of 205 inmates whom the MDC believes fall into the CDC's high risk categories.

facility was designed to hold only 474 inmates.[49]  Other than some inmates in the SHU, all inmates are now double-celled.

b.      Male inmates in the general population at MCC are housed either in small two-man cells (originally designed for single occupancy) with a single shared toilet and sink or in large open dormitory units.  The windows in the cells do not open.  Recreation on the roof is available for at most one hour a day.  Both housing configurations pose risks of COVID-19 transmission.

i. Dorm housing areas are particular breeding grounds for COVID-19.   Beds in these units are in one room, and far less than six feet apart.  Each dormitory houses between 20-30 men, all sharing one to two toilets and one to two sinks, plus sharing showers, phones, tables and dayroom benches.  Adequately sanitizing a space with those characteristics would require constant diligence and a continuous abundance of cleaning supplies. Cleaning once a day, or even a few times a day, would not prevent transmission of the virus. Social distancing, even at significantly reduced capacity, is virtually impossible due to the physical realities of the shared spaces in the dorms and the difficulty of adequately sanitizing a space inhabited by incarcerated people and a rotating group of staff.

ii. Double-cell housing areas also pose elevated risk of transmitting the virus, particularly during a lockdown.  (MCC has been on lockdown since March 13, and the BOP announced on April 14, 2020, that this lockdown would continue through May 18, 2020.)  Two men are held in less than 80 square feet with a shared toilet and sink and no fresh air, let out only three times a week for brief periods to shower and use the

---

[49] *The Real Scandal at the MCC*, The Atlantic (Aug. 16, 2019).

telephone.   If one person contracts the virus, the other will inevitably become sick.  And even if one's cellmate is not symptomatic, during the brief periods when groups of men are let out, they all share showers, telephones, and the email terminals, without sanitization in between uses.

c.    There is a small unit for approximately 30 female inmates, who are housed in two-woman cells with a shared sink and toilet.  No outside recreation is available to female inmates at MCC.  The windows on the unit do not open.   Several of the female inmates have chronic medical conditions.   At least one woman is reported to be currently in isolation and symptomatic.

d.    Beyond the physical realities of the MCC's facility, people in custody and staff are at particular risk of COVID-19 infection because of the operational realities of the jail setting. The freedom of movement of incarcerated people is obviously strictly curtailed. People in custody are therefore completely dependent on staff—and other incarcerated people performing job functions within the facility—to fulfill basic human needs, like food preparation and service, the cleaning of housing areas, laundry, access to showers, access to medical care, commissary, and provision of basic hygiene items like soap, toothbrushes, or toothpaste. If people in custody need to leave their housing areas, they must be physically escorted by officers, sometimes in handcuffs, chains, or other apparatuses. Each one of those operational functions requires movement of and contact between persons in a very large system, presenting an obstacle to sanitation, infection isolation, and social distancing particular to the correctional setting.

e. New inmates arrive at MCC each week.  New arrests from the community were admitted as recently as April 10, 2020.  While the pace of new arrests has slowed, it has not stopped,

and MCC continues to accept intra-prison transfers as well as new arrests. While the BOP has implemented a quarantine procedure to keep these new inmates separate from the general population for 14 days, they still use common showers, phones and computers.[50]

h.   MCC staff who work on the housing units are not provided N-95 masks. They have been given surgical masks, even when entering isolation or quarantine units. Not all MCC staff wear gloves while working on the housing units. Correctional officers who escort inmates to the hospital for COVID-19 tests also do not have N-95 masks.

i.  No hand sanitizer is currently available to inmates at MCC.

j. Tissues are not readily available. Inmates use toilet paper to blow their noses. Each inmate is provided only one roll of toilet paper per week.

k.   Each inmate is given one small bar of soap a week, at most.[51] Access to additional soap is limited to those inmates who have sufficient commissary funds to purchase it, and dependent on the commissary being open; it is routinely closed during lockdowns.[52]

l.   Inmates prepare all inmate meals and this meal preparation, with the exception of kosher and halal meals, is performed in a single kitchen.

m.   Inmates are responsible for sanitizing the housing unit common areas, and frequently lack adequate cleaning supplies to do so. When inmates have tested positive, inmate orderlies have been used to clean the infected units, and have not been given N-95 masks.

---

[50] *See* April 14, 2020 Letter from MCC Warden to Chief Judge Mauskopf, *available at* https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200414_040934.pdf.

[51] *Id.*

[52] *Id.*

n.    Inmates share telephones to call lawyers and family, as well as a limited number of email terminals.  There are no wipes or other cleaning supplies readily available to clean the telephones and keyboards between uses.

o.  The facility has not informed the inmate population of what the protocol will be for symptomatic inmates;[53] absent a transparent protocol, inmates in correctional settings often fear they will be confined in solitary if they volunteer that they are symptomatic.  In the MCC, this fear is reality: the facility has confirmed that some inmates who have tested positive have been confined in a special Solitary Housing Unit built to detain defendants standing trial for the 9/11 attacks.

31.    Inmates at MCC who do contract COVID-19 are at higher risk for developing acute symptoms than if they were in the community, because MCC lacks the medical resources to care for symptomatic inmates.

a.    There is no separate medical facility for ill inmates.[54]  Unlike many Federal Correctional Institutions, MCC has no physical space in which an ill inmate can convalesce that is separate from other inmates, warm, clean and has access to fresh water and regular hand-washing.  Rikers Island, by comparison, has a medical facility on site, which includes negative pressure rooms to prevent the spread of contagious disease.

b.    On weekdays, there are only two doctors regularly available at MCC to care for all 718 inmates.  Even this limited number is likely to decrease as doctors themselves go into quarantine.  Neither of these doctors specialize in infectious diseases.

---

[53] *Id.*

[54] *Id.*

c.      There are no doctors regularly at MCC on weekends or evenings.

d.      Inmates are only allowed out of their cells during the current lockdown for a brief period every other day.  While locked in, the only way inmates can seek medical attention is by ringing the emergency bell in the cell.  Inmates report these bells largely going unanswered or being disabled.

e.      MCC is monitoring symptomatic and exposed inmates through temperature checks.[55]  This means that those people who contract COVID-19 but do not have an elevated fever will not be identified as positive – or even symptomatic – even though a person may be infected with the virus and have no fever or a low-grade one.[56]

f.      People who contract COVID-19 can deteriorate rapidly, even before a test result can be received.  They need constant monitoring. Most people in the higher risk categories will require more advanced support: positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation. Such care requires specialized equipment in limited supply as well as an entire team of specialized care providers. MCC has neither specialized equipment nor specialized care providers.

32.      MCC is short-staffed.[57]  This staffing shortage has only increased as employees need to stay home to care for children whose schools are closed, care for sick or elderly family

---

[55] *See* April 14, 2020 Letter from MCC Warden to Chief Judge Mauskopf, *available at* https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200414_040934.pdf.

[56] Coronavirus Symptoms FAQ, *available at* https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-symptoms-frequently-asked-questions.

[57] *Id.*

members, and to care for themselves.  With fewer staff, correctional officers are less able to monitor inmates' health.

## VI. Reducing Population Size At Specific Correctional Facilities Is A Crucial Public Health Measure

33.     Every effort should be made to reduce chances of exposure to the novel coronavirus; however, given the proximity and high number of inmates, correctional staff, and healthcare workers at pre-trial detention facilities, it will be extremely difficult to sustain such efforts. Therefore, it is an urgent priority to reduce the number of people in detention facilities during this national public health emergency.  The urgency has only increased, as COVID-19 has infiltrated the federal prisons.  Now that the coronavirus is inside the MCC, the risk to staff and inmates has only increased and the lives of those who live and work inside the institution may be in peril.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  April 16, 2020
          Brooklyn, New York

_____
Dr. Jonathan Giftos

# CORONAVIRUS DISEASE 2019 (COVID-19) STAFF SCREENING TOOL

## DATE:_____

| | |
|---|---|
| **1. Temperature:** _____ °F     Method:  Mouth          Ear           Forehead | |

□ If Temperature (Mouth) ≥ 100.4°F,   or   Temperature (Ear) ≥101°F,    or   Temperature (Forehead) ≥ 100°F

Then Deny Access , Place on Leave (Not Safety & Weather Leave) for 3 days + STOP HERE & Proceed to Section 3

**2.   Signs** (Employee Complete)

| | |
|---|---|
| □ Yes   □ No | **New On-Set Cough**              # of Days_____ |
| □ Yes   □ No | **New Onset Trouble Speaking because of Needing to take a Breath** |
| □ Yes   □ No | **Stuffy/Runny Nose** |

➢   Contact the Medical Officer on Call for the Institution to provide Disposition

    ✓   Disposition by Medical Officer Assessment:
               □ Leave
               □ Work

**3.   Notification of Local Human Resources Department**

□ If Individual is placed on leave for Section 1 *or* 2, Then share document with HR Office for T&A purpose

➢ **HR**

□ Please have HSD place this document in the Employee's Medical Folder (Blue Folder) if leave is indicated

**Staff Name (Last, First):** _____  **Year of Birth (Year):** _____

**Institution:** _____     **State:** _____

*March 2020, Version 2.8*

# VISITOR/VOLUNTEER/CONTRACTOR COVID-19 SCREENING TOOL

| | |
|---|---|
| **1.  Have you…….** | |
| ☐ Yes ☐ No | a.  Traveled from or through, any of the following locations identified by the CDC as increasing epidemiologic risk for COVID-19 within the last 14 days?<br>China, Iran, South Korea, Italy, Japan |
| ☐ Yes ☐ No | b.  Had close contact with anyone diagnosed with the COVID-19 illness within the last 14 days? |
| | |
| **2.   Do you currently have a …………** | |
| ☐ Yes ☐ No | a.  Fever or Chills |
| ☐ Yes ☐ No | b.  Cough |
| ☐ Yes ☐ No | c.  Shortness of Breath |
| **3.  Perform a temperature check _____**°**F Method: oral / forehead (temporal) / tympanic** | |
| *Staff see instruction sheet for screening form.* | |

**Purpose of Visit (Circle one):**

Attorney-legal / Contractor / Volunteer

Social (visiting an inmate) – Inmate name/reg. number _____

Other - _____

**Visitor Name (Last, First):** _____

**Date:** _____

**Institution**: _____