UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

JOSE BRITO,

Defendant.

**ORDER**

20 Cr. 63 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Defendant Jose Brito is charged with unlawfully entering the United States after having been convicted of an aggravated felony and deported, in violation of 8 U.S.C. §§ 1326(a) and (b)(2).  (Indictment (Dkt. No. 5) at 1)

Brito was arrested on December 26, 2019, and presented that same day.  (Dkt. No. 4)  He was ordered detained on consent.  (Id.; see also Apr. 23, 2020 Def. Ltr. (Dkt. No. 12))  Brito is currently detained at the Metropolitan Correctional Center ("MCC").  No trial date has been set.

Brito now seeks release on bail.  (Apr. 23, 2020 Def. Ltr. (Dkt. No. 12))  The Government opposes his application.  (Apr. 28, 2020 Govt. Ltr. (Dkt. No. 16))  The Court conducted a hearing on Brito's application on May 13, 2020.

**BACKGROUND**

I.    **LEGAL STANDARDS**

The Bail Reform Act, 18 U.S.C. § 3142(g), directs courts to consider the following factors in determining whether pretrial release is appropriate:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2)  the weight of the evidence against the [defendant];

(3)  the history and characteristics of the [defendant], including . . . the
[defendant's] character, physical and mental condition, family ties,
employment, financial resources, length of residence in the community,
community ties, past conduct, history relating to drug or alcohol abuse,
criminal history, and record concerning appearance at court
proceedings; . . . and

(4)  the nature and seriousness of the danger to any person or the community that
would be posed by the defendant's release. . . .

18 U.S.C. § 3142(g).

In order for a defendant to be detained pending trial, the Government must

demonstrate (1) by a preponderance of the evidence, that there are no conditions or combination

of conditions that will ensure the defendant's return to court, or (2) by clear and convincing

evidence, that there is no condition or combination of conditions that will reasonably assure the

safety of the community if the defendant is released.  See United States v. English, 629 F.3d 311,

319 (2d Cir. 2011) ("At all times, however, 'the government retains the ultimate burden of

persuasion by clear and convincing evidence that the defendant presents a danger to the

community,' and 'by the lesser standard of a preponderance of the evidence that the defendant

presents a risk of flight.'" (citing United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001));

United States v. Chimurenga, 760 F.2d 400, 405-06 (2d Cir. 1985) ("The government has the

burden of establishing defendant's dangerousness by 'clear and convincing evidence.' . . . The

government's burden of proof on the question of risk of flight [for a pre-trial defendant] is not

by clear and convincing evidence, but rather by a preponderance of the evidence. . . ."); United

States v. Paulino, 335 F. Supp. 3d 600, 610 (S.D.N.Y. 2018) ("Regardless, in a presumption

case, the Government still bears the burden of persuasion of demonstrating dangerousness by

clear and convincing evidence and risk of flight by a preponderance of the evidence." (citing English, 629 F.3d at 319)); see also 18 U.S.C. §§ 3142(e), 3142(f).

## II.   THE PARTIES' ARGUMENTS

### A.   Defendant Brito

Brito argues that he should be released because, "[a]lthough only in his forties, he suffers from hypertension, a condition that heightens his risk for facing serious or life-threatening symptoms if he were to contract COVID-19. . . . Mr. Brito's release from the MCC is necessary in light of the public health crisis that imperils his health."  Brito seeks release to his wife's custody.  (Apr. 23, 2020 Def. Ltr. (Dkt. No. 12) at 1)

Brito further contends that he is "suffer[ing] violations of his constitutional rights," because "[t]he conditions of confinement at the MCC during the current pandemic have curtailed Mr. Brito's Sixth Amendment right to the effective assistance of counsel. . . . For nearly two months, Mr. Brito has experienced a complete disruption of his right to counsel. . . . While Mr. Brito has had one call with defense counsel over the past two months, he has not been able to have any contact with his attorney on his immigration case."  (Id. at 6-7)

Brito argues that, if released, he presents no danger to the community and no risk of flight:  "[h]is sole charge is Illegal Reentry and he has no prior history of violent or assaultive conduct.  Nor does Mr. Brito pose a serious risk of flight if released.  The very nature of the charge against Mr. Brito – that he keeps returning to New York City despite deportation – suggests that he is not a flight risk.  New York City has become Mr. Brito's home.  He lives in the city with his wife and four year old son . . . [who is] an American citizen.  He has two other

children in New York City who are also citizens.  These family ties demonstrate that Mr. Brito

has no incentive to flee."  (Id. at 10)

>    **B.**    **The Government**

The Government opposes Brito's application for release on bail, arguing that (1)

he poses an enormous risk of flight due to a "demonstrated history of evading law enforcement

and ignoring law enforcement directives"; (2) he has not demonstrated compelling reasons for

his release, as his medical condition does not make him extraordinarily vulnerable to the

COVID-19 virus; (3) Brito's wife is not an appropriate person into whose custody he could be

released, because she "aided his flight from prosecution for the last two years"; and (4) the Sixth

Amendment does not require Brito's release.  (Apr. 28, 2020 Govt. Ltr. (Dkt. No. 16) at 5-6, 9,

11)  The Government further contends that the Bureau of Prisons ("BOP") is capable of

protecting the health and safety of its inmates.  (Id. at 6)

At the May 13, 2020 hearing, the Pre-Trial Services Office reiterated its view that

Brito should be detained on grounds of risk of flight.

## III.    BAIL REFORM ACT ANALYSIS

>    **A.**    **Nature of the Offense Charged**

As noted above, Brito is charged with illegal reentry after having been convicted

of an aggravated felony and deported.  (Indictment (Dkt. No. 5))  The Government claims that

Brito – who is a citizen of the Dominican Republic – first entered the United States illegally on

March 10, 2002, when he crossed the Rio Grande River.  He was apprehended, and told border

patrol agents that his name was "Ronald Fermin Rernoso."  He was released on a bond.  (Apr.

28, 2020 Govt. Ltr. (Dkt. No. 16) at 1)  Brito failed to appear at a scheduled hearing and an order

of removal was issued.  Brito also failed to appear at the U.S. Immigration and Naturalization

Services' ("INS") offices for his removal to the Dominican Republic.  His bond was revoked. (Id.)

On November 19, 2002, the New York City Police Department ("NYPD") arrested Brito for a narcotics offense.  On May 14, 2003, he was convicted of Attempted Criminal Possession of a Controlled Substance in the Third Degree, a felony.  He was sentenced to five years' probation.  The state court subsequently issued a bench warrant for a probation violation.  Brito failed to appear and he "remained at large for nearly two years."  (Id. at 2; PTS Rpt. at 3)

On April 4, 2007, Brito was arrested for another narcotics distribution offense. On June 16, 2008, he was convicted of Criminal Sale of a Controlled Substance in the Fifth Degree, a felony.  Brito was sentenced to eighteen months' imprisonment.  (Apr. 28, 2020 Govt. Ltr. (Dkt. No. 16) at 2)  After serving his term of imprisonment, Brito was removed from the United States on July 30, 2008.  (Id.)

On October 14, 2011, Brito was arrested by border patrol agents in Texas, after he was found to be in the United States illegally.  (Id.)  Brito subsequently pled guilty to a federal charge of illegal reentry and was sentenced to 20 months' imprisonment.  (Id.)  Brito was ordered removed and deported for a second time on May 7, 2013.  (Id.)

On October 13, 2013, Brito was again apprehended by immigration authorities in Texas.  He told the border patrol agents that his name was "Rafael Brito-Bonilla."  Moreover, each one of Brito's ten fingerprints had been altered, in an apparent attempt to conceal his true identity.  (Id. at 2-3)  The Government has submitted images of Brito's ten fingerprints; each image shows a black smudge in the middle of the fingertip.  (Apr. 28, 2020 Govt. Ltr. at 3)  After his October 13, 2013 arrest, Brito also told numerous lies to the border patrol agents, including

that he had never before been apprehended at the border; that he had never used an alias; that he had never been removed from the United States; and that he had never lived in the United States. (Id. at 3)  He was removed from the U.S.  (PTS Rpt. at 4)

In the summer of 2017, immigration officials learned that Brito had returned to the United States and was living with his wife in Manhattan.  A criminal complaint was prepared, and an arrest warrant was issued on November 20, 2017.  The next day, agents attempted to arrest Brito at his residence.  Video from a surveillance camera showed that Brito had entered the apartment the evening before and had not departed.  Agents also heard movement inside the apartment.  Brito never came out of his apartment, however, and the agents eventually left.  A confidential informant told the agents that Brito and his wife packed their belongings and fled the apartment after the agents left. (Id. at 3-4)

Over the next two years, law enforcement officers actively sought to apprehend Brito, using administrative subpoenas and conducting surveillance.  (Id. at 4)

On December 18, 2019, the NYPD arrested Brito.  Although Brito initially provided an alias to the arresting officer, he was later positively identified and transferred into federal custody.  (Id. at 4)

The charge against Brito carries a maximum sentence of 20 years' imprisonment. 8 U.S.C. § 1326(b)(2).

## B.    **Weight of the Evidence**

The weight of the evidence against Brito is quite strong, as he was identified by his fingerprints and the charge is based on documentary records in the possession of the U.S. Government.

C.     **History and Characteristics of the Defendant**

Brito is approximately 41 years old and is a citizen of the Dominican Republic, where he was born and raised.  Brito has lived in Manhattan for the last six years with his wife and their child.  He has worked in the past as the assistant to a building superintendent.  Brito reports no assets or liabilities.  Brito's mother resides in both New York and the Dominican Republic, and his siblings reside in New York, Pennsylvania, North Carolina, and Italy.  (PTS Rpt. at 2)

D.     **Danger to the Community and Risk of Flight**

Brito is not and has never been charged with a crime of violence.  Based on the facts set forth above, however, he clearly presents an enormous risk of flight.  He has repeatedly failed to appear when released on bond.  He has repeatedly used aliases when arrested.  He has repeatedly returned to the United States after having been deported.  And he has taken extraordinary steps to avoid apprehension, including altering his fingerprints.  Brito is clearly not susceptible to court supervision.

E.     **Conclusion**

Having considered the factors listed in the Bail Reform Act, the Court concludes that the Government has met its burden of demonstrating that there are no conditions or combination of conditions that will ensure the defendant's return to court if he is granted pretrial release.

IV.     **"COMPELLING REASON" FOR RELEASE**

Brito contends that – regardless of the Bail Reform Act factors – he is entitled to release under 18 U.S.C. § 3142(i), due to the ongoing COVID-19 pandemic.

Brito argues that COVID-19 poses a grave danger to his health, because he suffers from hypertension and a nasal polyp.  (Apr. 23, 2020 Def. Ltr. (Dkt. No. 12) at 9)

7

Brito further asserts that pretrial release is necessary to protect his Sixth

Amendment right to counsel:

> For nearly two months, Mr. Brito has experienced a complete disruption of his right to counsel.  On February 27, 2020, the MCC entirely shut its doors to legal and social visitation for eight straight days.  During that time, Mr. Brito was confined to a single jail cell 24 hours a day.  He, like all inmates, was denied phone calls to his attorney and lacked computer access for more than a week.  In all of March, there was a brief, three-day window during which counsel could communicate with clients in person. . . . On Friday, March 13, 2020, in response to the public health crisis posed by COVID-19, the [Bureau of Prisons ("BOP")] issued a notice that all legal and social visits in all federal correctional facilities would be suspended for at least 30 days.  Less than a month later, the BOP instituted a lockdown:  no inmates are allowed out of the facility for any reason, including court appearances.  Mr. Brito has been confined to a single cell, with limited access to phone calls or a computer to communicate with his attorney.  When Mr. Brito finally obtained a legal call on April 21, 2010, it was in a counselor's office where he was deprived of a private, privileged conversation with counsel. . . . While Mr. Brito has had one call with defense counsel over the past two months, he has not been able to have any contact with his attorney on his immigration case– a case that overlaps with the Illegal Reentry charge.  To mount an effective defense at trial and to ensure that his interests are fully and effectively represented in immigration court, Mr. Brito must be released from custody.

(Id. at 6-7)

### A.   18 U.S.C. § 3142(i)

Section 3142(i) provides that a "judicial officer may, by subsequent order, permit

the temporary release of the person, in the custody of a United States marshal or another

appropriate person, to the extent that the judicial officer determines such release to be necessary

for preparation of the person's defense or for another compelling reason."  18 U.S.C. § 3142(i).

#### 1.   Danger from COVID-19

There is no question that COVID-19 presents an enormous risk to inmates

currently in detention.

> Though the BOP has admirably put transmission mitigation measures in place, see Federal Bureau of Prisons, Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp, in the event of an outbreak at the [MCC] (where the Defendant is currently being detained), substantial medical and security challenges would almost certainly arise.  A

comprehensive view of the danger the Defendant poses to the community requires considering all factors – including this one – on a case-by-case basis.

United States v. Stephens, 2020 WL 1295155, at *2 (citing United States v. Raihan, No. 20-cr-68 (BMC) (JO), Dkt. No. 20 at 10:12–19 (E.D.N.Y. Mar.e 12, 2020)).  During the May 13, 2020 hearing, defense counsel represented that five inmates and forty staff members at MCC have tested positive for COVID-19.

Brito, who is approximately 41 years old, asserts that he suffers from hypertension.  (Apr. 23, 2020 Def. Ltr. (Dkt. No. 12) at 9)  For those who contract COVID-19, a history of hypertension has been associated with "increased illness severity and adverse outcomes."  Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), Centers for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last accessed May 17, 2020).

There is no concrete evidence that Brito suffers from clinically significant hypertension.  When interviewed at the MCC on three separate occasions between December 26, 2019 and January 13, 2020, Brito denied suffering from hypertension.  His BOP medical records reflect blood pressure readings of 129/90 on December 26, 2019 and 130/88 on January 2, 2020. The Centers for Disease Control and Prevention ("CDC") describe having high blood pressure "under control" as having blood pressure lower than 140/90 mmHg.  Centers for Disease Control & Prevention, Blood Pressure Control, https://www.cdc.gov/vitalsigns/blood-pressure/index.html (last accessed May 15, 2020).  Although a BOP physician has prescribed Brito medication for his nasal polyp, he has not been prescribed any blood pressure medication.

Given these facts, there is no basis for this Court to find that Brito is significantly more susceptible to COVID-19 than other inmates.  Nor has Brito alleged that he has been

exposed to the virus or that he has not received appropriate medical care.  In essence, Brito "makes a generalized argument that the fact of the ongoing pandemic itself is enough to justify temporary release."  United States v. Chandler, 2020 WL 1528120, at *2 (citing United States v. Hamilton, No. 19-cr-54-01 (NGG), 2020 WL 1323036, at *1 (E.D.N.Y. Mar. 20, 2020)).

The Court concludes that the COVID-19 pandemic does not constitute a "compelling reason" for Defendant's release on bail pursuant to Section 3142(i).  See United States v. Marte, No. 19-cr-795 (SHS), 2020 WL 1505565, at *1 (S.D.N.Y. Mar. 30, 2020) ("Pursuant to 18 U.S.C. § 3142(i), the Court concludes that, in the absence of any evidence that defendant has a special condition making him substantially vulnerable to Covid-19, the pandemic alone, which is affecting the community in its entirety, is not a compelling reason warranting release at this point in time."); see also United States v. Steward, No. 20-cr-0052 (DLC), 2020 WL 1468005 (S.D.N.Y. Mar. 26, 2020).

## 2.      Sixth Amendment Argument

Brito asserts that the MCC has been closed to visitors since February 2020 (with the exception of three days in March), that his Sixth Amendment right to counsel has been violated, and that the only appropriate remedy for this constitutional violation is immediate pretrial release.  (Apr. 23, 2020 Def. Ltr. (Dkt. No. 12) at 6)

The spread of COVID-19 throughout New York State – and the country – has compelled the Bureau of Prisons to suspend all visits, including legal visits.  United States v. Stephens, No. 15-cr-95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (citing Federal Bureau of Prisons, Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp (explaining that "legal visits will be suspended for 30 days" nationwide) (last accessed May 15, 2020); see also Federal Bureau of Prisons, COVID-19 Action Plan:  Phase Five,

https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last accessed May

15, 2020); Federal Bureau of Prisons, BOP Implementing Modified Operations,

https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed May 15, 2020).  Inmates do

have access to counsel, however.  They receive 500, instead of 300, minutes of phone time per

month.  Federal Bureau of Prisons, <u>BOP Implementing Modified Operations</u>,

https://www.bop.gov/coronavirus/covid19_status.jsp.  And prison officials have stated that

"[c]ase-by-case approval at the local level and confidential legal calls will be allowed in order to

ensure access to counsel.  If approved for an in-person visit, the attorney will need to undergo

screening using the same procedures as staff."  <u>Id.</u>

   Although the Court is concerned about Brito's access to counsel, it cannot find

that BOP's decision to suspend all legal visits is unreasonable in light of the global pandemic and

the threat it poses to inmates, residents of New York City, and the nation at large.

   The Court concludes that the suspension of legal visits does not constitute a

"compelling reason" under Section 3142(i) for Brito's release on bail given the enormous risk of

flight that he presents.

## **CONCLUSION**

For the reasons stated above, Defendant Brito's application for release on bail (Dkt. No. 12) is denied.  Given the still evolving nature of this health crisis, however, and the challenges it poses to prison facilities, see Federal Defenders of New York, Inc. v. Federal Bureau of Prisons, No. 19-1778, slip op. at 26-27 (2d Cir. Mar. 20, 2020), his motion is denied without prejudice to renewal in the event that circumstances materially change.

Dated:  New York, New York
        May 18, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge